UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- X

**BENNETT CASTELLO**,

                        Petitioner,

          – against –

**EARL BELL**, *superintendent of Clinton Correctional Facility*,

                    Respondent.

------------------------------------------------------------- X

**MEMORANDUM
DECISION AND ORDER**
20-CV-5525 (AMD)

**ANN M. DONNELLY**, District Judge.

      The *pro se* petitioner, currently incarcerated at Clinton Correctional Facility, petitions for a writ of habeas corpus under 28 U.S.C. § 2254.  A jury convicted the petitioner of two counts of predatory sexual assault, two counts of first-degree rape, first-degree sexual abuse and first-degree burglary as a sexually motivated felony.  He was sentenced as a predicate violent felon and a predatory sexual offender to concurrent terms of 22 years to life on the predatory sexual assault counts, 22 years on the rape and burglary counts, and 7 years on the sexual abuse count, to be followed by 20 years of post-release supervision.[1]  The petitioner argues that the trial court (1) should have suppressed identification evidence; (2) admitted expert testimony in violation of the Confrontation Clause; (3) allowed improper rebuttal testimony; (4) admitted illegally recorded phone calls; and that (5) the prosecutor's summation deprived him of a fair trial.  For the reasons that follow, the petition for writ of habeas corpus is denied.

---

[1] The Second Department vacated the first-degree rape convictions as lesser included offenses.  *People v. Castello*, 176 A.D.3d 730, 730–31 (2019).

## BACKGROUND

The petitioner followed thirteen-year-old E.P. into an elevator, pulled out a pair of scissors and threatened to kill her if she did not pull down her shirt.  The petitioner pulled down his pants and made her touch his penis.  He then dragged the child into the laundry room, and raped her.

The petitioner was charged with two counts of predatory sexual assault under two different theories: (1) that he committed first-degree rape and threatened the victim with a dangerous instrument during the course of the crime, in violation of New York Penal Law ("P.L.") § 130.95(1)(b), and (2) that he committed first-degree rape having previously been convicted of a sex crime, in violation of PL § 130.95(3).[2]  The petitioner was also charged with two counts of  first-degree rape, first-degree sexual assault and burglary as a sexually motivated felony.[3]

### I.    Suppression Motion

Shortly after the crime, E.P. identified the petitioner's photograph after looking at more than 800 photographs over the course of three days.  She also identified him in a lineup after his arrest.  The petitioner, represented by counsel, moved to suppress the identifications,[4] arguing that the identification procedure that the police employed was unduly suggestive, and tainted the subsequent lineup identification.  The Honorable Danny Chun conducted a suppression hearing

---

[2]  The petitioner admitted to a prior qualifying felony.

[3]  The petitioner was charged with multiple other crimes that the prosecution dismissed before the case was submitted to the jury, as well as with lesser-included offenses that the jury did not reach.  (Tr. 790–92.)

[4]  The petitioner also argued that the officers arrested him inside his home without a warrant but does not raise that argument in this petition.

at which Officer Jessica Fuentes, Detective Danielle Kenny and Detective Niurca Quinones testified to the following facts.

After E.P. reported the rape on April 29, 2013, she was taken to Kings County Hospital, where she was examined, and a rape kit was prepared. (ECF No. 11, Suppression Hearing Transcript ("Suppression Tr.") at 39.) Detective Kenny spoke with E.P. at the hospital, and E.P. told her that her attacker was a 30 to 35-year old "stocky" white man with "a round face," about 5' 8", and wearing a black ski cap. (Suppression Tr. at 91–92.)

Next, Detective Kenny took E.P. to the precinct, where she entered E.P.'s description into "photo manager," a "computer system that displays photos of people that were arrested within the five boroughs." (Suppression Tr. at 93, 95.) Photo manager "randomly" generated photographs and displayed them six at a time. (Suppression Tr. at 46, 51, 97.) E.P. looked at photographs for about an hour but did not recognize anyone. (Suppression Tr. at 97, 99, 103, 104.)[5] She came back the next day and looked at approximately 30 or 40 photographs in the Sex Offender Monitoring Unit database in Brooklyn, but did not recognize anyone. (Suppression Tr. at 97, 106.) When E.P. came back again on May 2, 2013, she looked through the Sex Offender Monitoring Unit database for the entire City of New York. (Suppression Tr. at 107.) After she looked at approximately 700 or 800 photographs, she identified the petitioner. (Suppression Tr. at 50.) Detective Kenny subsequently determined that the petitioner's picture was not among the pictures that E.P. viewed on April 29th or April 30th. (Suppression Tr. at 103–04.)[6]

---

[5] E.P. picked out "a couple photos that . . . had [the perpetrator's] eyes, had his round face," but she was certain that they were not of the perpetrator. (Suppression Tr. at 99.)

[6] Each picture is tagged with a unique arrest number. After E.P. identified the petitioner, Detective Kenny looked up the petitioner's arrest numbers and confirmed that his picture was not among those E.P. previously reviewed. (Suppression Tr. at 64, 168–69.)

On May 7, 2013, E.P. viewed a lineup that included the petitioner and five fillers.[7] (Suppression Tr. at 151.)  All six people were wearing black hats and white T-shirts, and Detective Kenny put them in a separate part of the precinct, so that E.P. could not see them before the lineup.  (Suppression Tr. at 64, 168–69.)  E.P. identified the petitioner as the perpetrator after a "[c]ouple of seconds."  (Suppression Tr. at 166.)  She cried, pointed straight at the petitioner and said, "He raped me in the elevator."  (Suppression Tr. at 64, 166–67.)

Defense counsel asked that the entire group of photographs that E.P. viewed on May 2nd be entered into evidence.  Detective Kenny produced a list of "sex offender I.D." numbers that corresponded to the photographs.  (Suppression Tr. at 49.)  However, Detective Kenny could not at that point determine which number was the petitioner's, nor did she know whether the numbers on the list were in the same order in which E.P. viewed the photographs.  (Suppression Tr. at 64, 111–12.)[8]

Judge Chun denied the motion to suppress identification testimony.

## II.   Trial

### A.   The Prosecution's Case

The petitioner went to trial before the Judge Chun and a jury.  The prosecution called seven witnesses:  E.P.; her father; nurse practitioner Alice Blair; Detective Michael Devivo; Detective Danielle Kenny; Police Officer Viktoriya Sadovskaya; and criminalist J. Luke Herman.  Their testimony established the following facts.

---

[7]  The fillers were police officers; none of them worked in the precincts involved in the investigation into the rape.  (Suppression Tr. at 151.)

[8]  Defense counsel also asked whether Detective Kenny dressed the individuals participating in the lineup in black ski hats "so that complainant would get a clue that she was looking at somebody . . . involved in the incident."  (Suppression Tr. at 64, 169–70.)  Detective Kenny responded that she used hats for "consistency."  (Suppression Tr. at 64, 79–80.)

Around 3:30 p.m. on April 29, 2013, thirteen-year-old E.P. was coming back home from a store down the block; her father buzzed her into the apartment building.  (ECF No. 11-1, Trial Transcript ("Trial Tr.") at 20–23.)  The petitioner followed her into the building and into the elevator, and pressed the button for the basement.  (Trial Tr. at 426.)  The petitioner threatened E.P. with scissors and forced her to expose her breasts and touch his penis.  (Trial Tr. at 430.) He then dragged E.P. into the laundry room, threw her on the folding table, and inserted the tip of his penis into her vagina.  (Trial Tr. at 437–38.)  Frustrated that he could not fit his entire penis, he threw E.P. on the floor and again inserted the tip of his penis into her vagina.  (*Id.*)  He heard a loud noise, told E.P. that he would kill her if she told anyone what happened and ran away.  (Trial Tr. at 439–54.)

E.P. immediately told her parents about the rape and called 911.  During the call, E.P. described the man who raped her as 5'8", the same height as her father but more "bulky," with "bright blue eyes."  (Trial Tr. at 396, 608.)  Officer Viktoriya Sadovskaya responded to the 911 call; E.P. largely repeated the description of her assailant, noting that he weighed about 160 pounds and said his eyes were "light" and "blue green." (Trial Tr. at 608–11.)

E.P. went by ambulance to the hospital, where she was examined, and a sexual assault kit was prepared.  (Trial Tr. at 461–62.)  In an interview with Detective Kenny, E.P. said her attacker was "a male white, 30 to 35 years old, about 5'8", 185 pounds," with "light-colored eyes."  (Trial Tr. at 575.)  Detective Kenny took E.P. to the 77th precinct.  Over the next few days, she looked through hundreds of pictures on photo manager.  She identified the petitioner on May 2, 2013, and Detective Kenny picked him up for questioning on May 7, 2013.  (Trial Tr. at 576.)  The petitioner was 40 years old, 5'8" tall, weighed 200 pounds and had green eyes. (Trial Tr. at 577–78, 595–96.)

EP identified the petitioner in a lineup, and Detective Kenny arrested him.  (Trial Tr. at 585.)  The petitioner denied committing the crime, and agreed to give a saliva sample for DNA testing.  (Trial Tr. at 586.)

Forensic examiners recovered DNA from the waistband of E.P.'s sweatpants.  (Trial Tr. at 662–63.)  Because the DNA sample was so small, the criminalists utilized YSTR testing, which "looks at specific loci on the Y chromosome specific to men."  (Trial Tr. at 644.)  Because "YSTRS are inherited directly in a paternal lineage, . . . all male relatives in that same line will have that same YSTR profile."  (Trial Tr. at 668.)  Statistically, that means that "one in every 602 Caucasian individuals" would be a match.  (Trial Tr. at 674.)  The DNA profile "matched" the petitioner.  (Trial Tr. at 673.)[9]

## B.   The Defense Case

The petitioner testified as part of the defense case.  He denied assaulting E.P. and testified that he weighed "about 240, 245 pounds" in May 2013 and that his eyes were hazel.  (Trial Tr. at 718–19.)  He also explained that he was "[m]ost likely" at work on the day of the rape, although he could not remember with certainty.  (Trial Tr. at 725, 730.)  He denied telling the police that he had not been to the area where the crime occurred in the last ten years.  (Trial Tr. at 722.)  He also denied subsequently telling the police that he was fixing jet skies with his father near the victim's home for "the entire day" of the rape.  (Trial Tr. at 722–23.)  He claimed that the detectives asked only "about a ten-day period," and did not specify a particular date.  (Trial Tr. at 724.)

---

[9]  Defense objected that the DNA evidence violated the petitioner's Confrontation Clause rights, because the expert who testified did not perform all of the analysis himself.  (Trial Tr. at 650, 671, 681.)  Judge Chun denied the objections, because "there was a witness on the stand present available for cross-examination" who "did at least some of the testing."  (Trial Tr. at 681.)

### C.    The Rebuttal Case

Jacob Chechkov, the petitioner's employer and landlord, had surveillance cameras in the petitioner's building.  The petitioner did not appear on any tapes on April 29, 2013, around the time E.P. was raped.  (Trial Tr. at 765–66.)  Mr. Chechkov spoke with the petitioner when the petitioner was at Rikers Island.  The petitioner told Mr. Checkov that he knew exactly what he did on the day of E.P.'s assault, and said that he took Mr. Checkov's van (which did not have a GPS or license plates) and went to a café for several hours.  (Trial Tr. at 753, 767–69.)

Detective Quinones and Detective Kenny interviewed the petitioner after advising him of his *Miranda* rights.  (Trial Tr. at 778.)  The petitioner first told the detectives that he had not been to the area where E.P. was assaulted "for many years" but then admitted that "he was around there" on April 29, 2013 "to visit his father."  (Trial Tr. at 779.)[10]

### D.    Verdict and Sentencing

On February 18, 2015, the jury convicted the petitioner of two counts of predatory sexual assault, two counts of first-degree rape, first-degree sexual abuse and first-degree burglary as a sexually motivated felony.  (Trial Tr. at 930.)

Judge Chun determined that the petitioner was a "violent felony offender" and a "predatory sexual offender" based on his prior conviction for Sodomy in the First Degree, a violent felony.  (Sentencing Tr. at 939.)  He sentenced the petitioner to concurrent indeterminate terms of 22 years to life on the predatory sexual assault counts, concurrent determinate terms of

---

[10]  Defense counsel objected that Mr. Chechkov and Detective Quinones's testimony did not "refute anything the defendant said" and was merely "another chance for the People to present their direct case."  (Trial Tr. at 747–48.)  Counsel also argued that the admission of the recorded phone calls "ambush[ed] the defense."  (Trial Tr. at 748.)  Judge Chun allowed the testimony because the petitioner "testified that he did not remember what he did exactly on that afternoon" and that the petitioner "was aware of the phone calls" because he said so "on almost every call."  (Trial Tr. 748–50, 753.)

22 years on the rape and burglary counts, and a concurrent determinate term of 7 years on the sex abuse count.  (Sentencing Tr. at 944–45.)

### III.     The Appeal and Application for Leave to Appeal

In April 2018, the petitioner, represented by counsel, appealed his conviction to the Appellate Division, Second Department.  (ECF No. 11-2 at 1–67.)  The petitioner argued that (1) the photographic identification procedure and lineup were unduly suggestive; (2) the expert testimony about the DNA evidence violated his Confrontation Clause rights; (3) the rebuttal testimony of Jacob Chechkov and Niurca Quinones violated the Due Process Clause; (4) the admission of the Rikers calls violated his Fourth Amendment and Due Process rights; (5) the prosecution's summation deprived him of a fair trial; and (6) his convictions for first-degree rape should be dismissed as lesser-included offenses.

The Second Department dismissed the rape convictions as lesser-included offenses but otherwise affirmed the petitioner's conviction and sentence.  *People v. Castello*, 176 A.D.3d 730 (2d Dep't 2019).  The court agreed that the prosecution's "failure to preserve a record of what was viewed during the photo identification procedure gives rise to a rebuttable presumption of suggestiveness," but held that the government "rebutted that presumption . . . through the testimony of the detective, which established that she utilized the various databases applying the description of the perpetrator supplied by the complainant" and because E.P. "identified the [petitioner] in a lineup."  *Id.* at 732–33 (citation omitted).  The court rejected the petitioner's arguments that the photographic identification was unreliable because his sex offender number did not appear on Detective Kenny's list and that the lineup was not sufficiently attenuated as "unpreserved for appellate review."  *Id.* at 733.  The court also dismissed the petitioner's Confrontation Clause and rebuttal arguments as "without merit."  *Id.*  Finally, the court found

that the petitioner's claims about the Rikers recordings and the prosecutor's summation remarks were "unpreserved."  *Id.* at 733–34.

The Court of Appeals denied the petitioner's application for leave to appeal on January 17, 2020.  (ECF No. 8 at 4.)

## LEGAL STANDARD

The Antiterrorism and Effective Death Penalty Act ("AEDPA") limits the authority of federal courts to grant writs of habeas corpus to state prisoners.  Section 2254(a) permits a federal court to entertain only those applications claiming violations "of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  AEDPA's standards are "difficult to meet;" the Act sets up a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt."  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (cleaned up).  A federal court may not "review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment."  *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  This bar applies to substantive and procedural state law grounds alike.  *Id*. at 729–30.

As for claims that have been "adjudicated on the merits in State court proceedings," a federal court may not issue a writ of habeas corpus unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  *Cullen*, 563 U.S. at 181 (quoting 28 U.S.C. § 2254(d)).  "Clearly established federal law is limited to the jurisprudence of the Supreme Court at the time of the relevant state court decision."  *Aponte v. La Manna*, No. 19-CV-596, 2020 WL 4571820, at *3

9

(E.D.N.Y. Aug. 6, 2020) (citing *Howard v. Walker*, 406 F.3d 114, 122 (2d Cir. 2005)).  Finally, federal court review "is limited to the record that was before the state court that adjudicated the claim on the merits," and the petitioner carries the burden of proof.  *Cullen*, 563 U.S. at 180–81.

## DISCUSSION

The petitioner raises the same claims he made on appeal to the Second Department: that E.P.'s identification and rebuttal testimony violated the Due Process clause, the expert testimony violated the Confrontation Clause, the trial court improperly admitted the Rikers calls, and the prosecution's comments in summation were unduly prejudicial.  (ECF No. 1-5 at 6–24.)

## I.    The Photographic Identification Procedure and Lineup

The petitioner argues that the photographic identification procedure was unduly suggestive.  The Court must defer to the Second Department's rejection of this argument on the merits, *see Castello*, 176 A.D.3d at 732–33, unless the decision was "contrary to . . . clearly established Federal law" or "based on an unreasonable determination of the facts."  *Cullen*, 563 U.S. at 181 (quoting 28 U.S.C. § 2254(d)).

The petitioner does not meet that standard.  "[C]onvictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside . . . only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."  *Simmons v. United States*, 390 U.S. 377, 384 (1968).  To determine whether a photographic identification procedure is unduly suggestive, a court considers "the totality of surrounding circumstances," *id.* at 383; "the photo array must not be so limited that the defendant is the only one to match the witness's description of the perpetrator," *United States v. Muhanad Mahmoud Al-Farekh*, 956 F.3d 99, 111 (2d Cir. 2020) (cleaned up).

In this case, E.P. gave three detailed and consistent descriptions of her assailant—during the 911 call, to Officer Sadovskaya and to Detective Kenny.  Then, she looked through more than 800 photos on three different days before identifying the petitioner.  (Suppression Tr. at 50, 91–93, 95, 97, 99, 103, 104, 106, 107; Trial Tr. at 396, 608–11.)  Detective Kenny entered E.P.'s description into a computer system that "randomly" generates photographs of persons who have been arrested in all five boroughs and match the description.  (Suppression Tr. at 46, 51, 93, 95, 97.)  The photographs were generated in screens of six photographs each.  (Suppression Tr. at 46, 51, 97.)  On April 29, April 30 and May 2, 2013, E.P. looked at photographs from the Sex Offender Monitoring Unit; Detective Kenny did not sort the pictures or otherwise arrange them.  After E.P. identified the petitioner on May 2nd, Detective Kenny ensured that his photograph was not among those E.P. saw on April 29th or April 30th.  (Suppression Tr. at 103–04.)  Finally, E.P. identified the petitioner in the lineup five days after she identified his photograph.  (Suppression Tr. at 151.)  Based on all of these circumstances, the identification was not "so impermissibly suggestive," *Simmons*, 390 U.S. at 384, as to violate the Due Process Clause.

Indeed, the Second Circuit has identified only three circumstances that make a photographic identification procedure unduly suggestive: "(1) a very small number of photographs, which are in turn presented in a manner that suggests to the witness that a specific person may be the suspect . . . ; (2) a large number of photographs depicting the same person . . . ; or (3) the utterance of suggestive comments by interrogators."  *United States v. Muhanad Mahmoud Al-Farekh*, 956 F.3d at 111–12 (collecting cases).  On the other hand, in a case like this one, when "there is a large display of photos arranged in no particular order or format, and the interrogators do not intimate which picture the witness should identify, the identification procedure is not impermissibly suggestive."  *Id.* at 112 (citations omitted).

11

The petitioner argues that the Court must nevertheless find that the photographic identification procedure was unduly suggestive because the prosecution did not introduce the photographs into evidence at the suppression hearing; Detective Kenny only had a list of sex offender numbers that she testified corresponded to the pictures she showed E.P.  While "the preferred procedure would have been to preserve the array," the Second Circuit has squarely declined to "draw an inference of suggestiveness from the failure of the police to preserve" it when "[n]othing in the record [otherwise] indicates that the [photographic identification procedure] was suggestive." *Sales v. Harris*, 675 F.2d 532, 538 & n.3 (2d Cir. 1982); *cf. Ragunauth v. Ercole*, No. 07-CV-1692, 2008 WL 5401586, at *8 (E.D.N.Y. Dec. 23, 2008) ("no presumption of suggestiveness arises from the failure of the police to preserve original photographic evidence" absent evidence of "bad faith").[11]

As for the petitioner's contentions that his sex offender number was not on the list that Detective Kenny provided to the court or that the photographic identification tainted the lineup, the Second Department has found them "unpreserved for appellate review," because the petitioner did not raise these arguments at the suppression hearing.  *Castello*, 176 A.D.3d at 733. "The Second Circuit has determined that New York's preservation rule is an independent and adequate state procedural ground ordinarily barring habeas review." *Read v. Thompson*, No. 13-CV-6962, 2016 WL 165716, at *10 (S.D.N.Y. Jan. 13, 2016) (cleaned up).  Accordingly, the Court must "decline to hear" any claims regarding the legal sufficiency of the evidence, because

---

[11] In any event, "suggestiveness must be balanced against" the overall reliability of a witness's identification.  *Sales*, 675 F.2d at 538.  To that end, courts must assess "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972).  All of these factors favor the admissibility of E.P.'s identification.

they were "not presented to the state courts consistent with the State's own procedural rules." *Shinn v. Ramirez*, 142 S. Ct. 1718, 1732 (2022).

A petitioner can overcome this procedural bar by showing "cause for the default and actual prejudice as a result of the alleged violation of federal law" or by demonstrating "that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750 (citations omitted). In order to establish "cause" for a procedural default, the petitioner must show that "some objective factor external to the defense impeded" his effort to comply with the state procedural rule in state court. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). For "actual prejudice," a petitioner must show that "errors at his trial . . . worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982). Finally, to establish a "fundamental miscarriage of justice," a petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U.S. at 496. The petitioner has not established that any of these exceptions apply.

In any event, the petitioner's contentions do not have merit. First, the petitioner provides no evidence that his sex offender number was not on Detective Kenny's list. To be sure, Detective Kenny could not identify the petitioner's number at the suppression hearing, but she explained that the computer system keeps track of every photo a witness reviews, and that she printed out the list right after E.P. finished going through the photographs. (Suppression Tr. at 110–12.) Second, because the photographic identification procedure was not unduly prejudicial, it could not have tainted the subsequent lineup. In short, the identification procedures were not unduly suggestive.

II.    **The DNA Expert**

The petitioner claims that the DNA testimony violated the petitioner's Confrontation Clause rights because the testifying witness, J. Luke Herman, did not personally do all of the testing.

The Second Circuit rejected an identical claim in *Washington v. Griffin*, 876 F.3d 395, 403 (2d Cir. 2017).  The court explained that the Confrontation Clause bars only testimonial evidence, and that the Supreme Court has not conclusively determined whether a DNA report is testimonial.  *See id.* at 407 ("none of the [Court's] opinions 'fully deals with the underlying question as to how . . . Confrontation Clause "testimonial statement" requirements apply to crime laboratory reports'" (quoting *Williams v. Illinois*, 567 U.S. 50, 92 (2012) (Breyer, J., concurring))); *accord Stuart v. Alabama*, 139 S. Ct. 36, 36 (2018) (Gorsuch, J., dissenting from the denial of certiorari) ("This Court's most recent foray in this field, *Williams* . . . , yielded no majority and its various opinions have sown confusion in courts across the country.").  Because AEDPA requires a habeas court to affirm a state court decision unless it is contrary to a "Supreme Court holding," the Second Circuit declined to disturb the Second Department's ruling.  *Washington*, 876 F.3d at 409 (cleaned up).  The same result must follow in this case. The Second Department determined that the petitioner's Confrontation Clause arguments were "without merit."  *Castello*, 176 A.D.3d at 733.  That was not "an unreasonable application of[] clearly established Federal law."  *Cullen*, 563 U.S. at 181.

Moreover, even if the DNA report was testimonial, "the Supreme Court has never held that the Confrontation Clause requires an opportunity to cross examine each lab analyst involved in the process of generating a DNA profile and comparing it with another."  *Washington*, 876 F.3d at 408.  Consequently, courts in this Circuit have held that "a defendant's right to confront

is satisfied where a supervising criminalist forms an independent opinion and was subject to cross examination." *Aponte*, 2020 WL 4571820, at *6; *see also Beckham v. Miller*, 366 F. Supp. 3d 379, 385 (E.D.N.Y. Feb. 7, 2019); *Sanchez v. Rock*, No. 12-CV-1605, 2014 WL 3866456, at *10 (E.D.N.Y. Aug. 6, 2014).  In this case, the petitioner had ample opportunity to cross-examine Mr. Herman, who supervised the report, "performed the initial examination on the sweatpants" and conducted "some of the serology testing."  (Trial Tr. at 649.)  The petitioner has not established a violation of his Sixth Amendment rights.

## III.    The Rebuttal Evidence

The petitioner claims that Jacob Chechkov and Detective Niurca Quinones's testimony violated his Due Process rights because it did not directly refute any of his testimony and was calculated to impeach his credibility.  The Second Department rejected this argument on the merits.  *Castello*, 176 A.D.3d at 733.  Accordingly, the petitioner must show that the challenged evidence was so prejudicial that the "conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).

The petitioner cannot do so, because "proper rebuttal is not limited to direct contradiction." *United States v. Barrow*, 400 F.3d 109, 120 (2d Cir. 2005) (collecting cases). Rather, "rebuttal encompasses any evidence that the trial judge concludes fairly counters and casts doubt on the truthfulness of factual assertions advanced, whether directly or implicitly, by an adversary." *Id.* at 121; *see also United States v. Redmond*, 841 F.3d 95, 108 (2d Cir. 2016) (same).  Moreover, "because rebuttal is necessarily a flexible concept," a trial judge has "broad discretion" to decide what falls within its scope. *Barrow*, 400 F.3d at 120.

In this case, the petitioner testified that he did not remember what he did on April 29, 2013, but that he probably went to work and then went home.  (Trial Tr. at 725, 729–30.)  The

petitioner also denied telling the detectives that he had not been to the area around E.P.'s house in ten years, and then admitting that he was in that area on April 29th but spent the day with his father.  (Trial Tr. at 722–24.)  The petitioner also insisted that the detectives never asked him about April 29th in particular, and asked him only "for the time span between the 29th and the 7th of May."  (Trial Tr. at 724.)  The rebuttal testimony established that (1) the petitioner made both those statements to the police; (2) the detectives asked him specifically about April 29th; (3) the petitioner worked until about 1 p.m. that day; and (4) the petitioner did not appear on his home surveillance camera after his shift ended.  (Trial Tr. at 753, 767–69; 778–79.)  The Rikers phone calls further established that the petitioner told Mr. Checkov that he knew exactly what he did on the day of the rape, rebutting the petitioner's assertion that he did not remember his whereabouts. The trial judge did not err in admitting this evidence.

In any event, "[c]onstitutional errors of this type are subject to harmless error review." *Redmond*, 841 F.3d at 112 (citation omitted).  That means the petitioner can succeed on this claim only if he demonstrates that the error "resulted in 'actual prejudice'" "in light of the record as a whole."  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *United States v. Lane*, 474 U.S. 438, 449 (1986)).  However, E.P.'s unequivocal identification and DNA evidence provided "overwhelming" evidence of the petitioner's guilt.  *Id.* at 639.

## IV.   The Rikers Phone Calls

The petitioner claims that the trial court violated his Fourth Amendment and Due Process rights when it admitted the taped Rikers phone calls into evidence, and permitted the prosecutor to play them for the jury.  Although the petitioner concedes that he knew that his phone calls were being recorded, he claims that he did not know—and did not consent to—the prison officials providing the recordings for use at the trial.  The Second Department found this claim

"unpreserved," because the petitioner did not raise this objection at the trial. *Castello*, 176 A.D.3d at 734; *see also* C.P.L. § 470.05(2) (requiring parties to register an objection during trial, when the court has an opportunity to remedy the error). As discussed above, the state court's determination that the petitioner did not preserve his objection is an independent and adequate state ground. *See Downs v. Lape*, 657 F.3d 97, 104 (2d Cir. 2011). Because the petitioner does not demonstrate cause for the default, actual prejudice or that failure to consider the claims will result in a fundamental miscarriage of justice, this Court may not review his unpreserved arguments.

The petitioner's Fourth Amendment argument is barred for another reason: "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992) (emphasis omitted) (quoting *Stone v. Powell*, 428 U.S. 465, 481–82 (1976)). Consistent with that rule, the Second Circuit directs district courts to review Fourth Amendment habeas claims only "if the state has provided no corrective procedures at all to redress the alleged fourth amendment violations" or "if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." *Id.* (citation omitted). Because the petitioner does not argue that either situation applies—and because he had the opportunity to object to the phone calls at the trial and then to appeal the state court's ruling—this Court need not review his Fourth Amendment claims.

In any event, the petitioner's arguments are not persuasive. It has long been settled in this Circuit that the "practice of automatically taping and randomly monitoring telephone calls of

inmates in the interest of institutional security is not an unreasonable invasion of the privacy rights of pretrial detainees" and therefore does not violate the Fourth Amendment. *United States v. Friedman*, 300 F.3d 111, 116, 123 (2d Cir. 2002) (quoting *United States v. Willoughby*, 860 F.2d 15, 21–22 (2d Cir. 1988)). Indeed, courts routinely decline to suppress recordings of these calls when, as in this case, pretrial detainees know their phone calls are being recorded. *See id.*; *United States v. Workman*, 80 F.3d 688, 694 (2d Cir. 1996). The petitioner cites no case—and the Court has found none—in which a court suppressed a recording of a prison phone call because a pretrial detainee was not told specifically that his phone call could be used at trial. Moreover, the prosecution in this case did not introduce the calls in its case in chief but only as rebuttal evidence. "[E]vidence obtained in an illegal search and inadmissible in the Government's case in chief" is nevertheless admissible "to impeach statements made by the defendant." *United States v. Havens*, 446 U.S. 620, 624 (1980). Defendants "must testify truthfully or suffer the consequences." *Id.* at 626.

The same goes for the petitioner's claim that the recording "prejudiced him in the eyes of the jury." (ECF No. 1-5 at 18.) "[T]o prevail on a claim that an evidentiary error deprived the defendant of due process under the Fourteenth Amendment he must show that the error was so pervasive as to have denied him a fundamentally fair trial." *Collins v. Scully*, 755 F.2d 16, 18 (2d Cir. 1985). However, the "properly admitted evidence against [the petitioner] was very strong, including the firm, unwavering eyewitness testimony of [E.P.], who had had ample opportunities to observe [the petitioner] at close range[ and] identified him at trial," as well as the DNA evidence. *Id.* at 19. Moreover, the Rikers phone calls "did not directly attribute to [the petitioner] the commission of the crime charged." *Id.* Under these circumstances, even if the

phone calls were unfairly prejudicial, the petitioner has not shown that "absence of fairness fatally infected the trial." *Id.* (cleaned up).[12]

## V.  The Prosecution's Summation

As he did on appeal, the petitioner challenges the following comments in the prosecutor's summation: (1) that the petitioner's defense was "ridiculous," "preposterous" and "absurd" (Trial Tr. at 834–36, 842–43, 851); (2) that the petitioner's argument about his eyes being hazel, not blue or green, was a "distraction," not a real "issue" (Trial Tr. at 818–19); (3) that defense arguments amounted to "shoulda shoulda shoulda" (Trial Tr. at 821); (4) that the petitioner was tailoring his arguments to fit the evidence (Trial Tr. at 820); (5) that the prosecution's witnesses were believable and the case against the petitioner was "overwhelming" (Trial Tr. at 828, 830, 833, 835, 841, 844, 851); (6) that the criminalists followed proper procedures (Trial Tr. at 836); (7) her comment, in the context of the DNA evidence, in which she started to suggest that this was not the petitioner's "first" sexual assault before the trial court sustained counsel's objection; (Trial Tr. at 839); (8) that the YSTR DNA evidence was a "match" (Trial Tr. at 838–39); and (9) that E.P. wouldn't want "the wrong man to be apprehended" (Trial Tr. at 833).

Pursuant to New York's "contemporaneous objection rule," a general objection to summation "is not sufficient" to preserve a claim for appeal; a defendant must name "the specific error" the prosecution committed so that the trial court has an opportunity to consider a concrete legal error "at the time of [its] ruling." *Downs v. Lape*, 657 F.3d 97, 103–04 (2d Cir. 2011); C.P.L. § 470.05(2).  This rule ensures that "parties draw the trial court's attention to any potential error while there is still an opportunity to address it," and prevents "those who fail to do

---

[12]  The petitioner also claims that the admission of the Rikers phone calls violated his right to equal protection (ECF No. 1-5 at 18), but he does not make any argument on this point.

so from 'sandbagging' the opposing party and the trial court on appeal." *Whitley v. Ercole*, 642 F.3d 278, 288 (2d Cir. 2011) (citations omitted).

Defense counsel registered only general objections to most of the challenged comments, or did not object at all. (*See* Trial Tr. 818, 819, 840, 841, 843, 850.) Accordingly, the Second Department found the petitioner's claims about the prosecutor' summation "unpreserved for appellate review." *Castello*, 176 A.D.3d at 734. As discussed above, because the Second Department's decision was based on a "state law ground . . . independent of the federal question," a federal court may not review it unless the state law ground was not "adequate to support the judgment." *Coleman*, 501 U.S. at 729. And the petitioner does not establish cause for the default, actual prejudice or that failure to consider the claims will result in a fundamental miscarriage of justice.

In any event, the petitioner cannot succeed on the merits. Most of the challenged remarks were fair comment on the evidence and on the defense's summation. *Mickens v. United States*, 53 F. Supp. 2d 326, 332 (E.D.N.Y. 1999) ("a prosecutor does have the right to comment on the defense counsel's argument during summation"). For example, criminalist Herman stated several times that the DNA sample from E.P.'s sweatpants "matched" the petitioner; the prosecutor simply repeated that testimony to the jury. (Trial Tr. 673, 683–84.)

The prosecutor's argument that E.P. was not lying or mistaken about what happened was appropriately responsive to defense counsel's repeated arguments that E.P. was "hysterical" and "frantic" and "had her eyes closed" (Trial Tr. at 806, 815). *See People v. Barber*, 13 A.D.3d 898, 900 (3d Dep't 2004) (prosecutor's comments during summation that the victim had "no motive to lie" did not constitute improper vouching where "the defense ha[d] attacked the credibility of the prosecution witnesses in summation"), *appeal denied,* 795 N.Y.S.2d 171

(2005).  The prosecutor's argument that there was no meaningful difference between the way E.P. described the petitioner's eye color—light blue and blue-green—and the petitioner's claim that his eyes were hazel was both reasonable and responsive to defense counsel's claim that the difference meant that E.P. identified the wrong person.  (*See* Trial Tr. at 805 (telling the jury that E.P. "said he had blue eyes" whereas the petitioner "does not have blue eyes").)  Nor did the prosecutor accuse the petitioner of "tailoring his arguments to fit the evidence" (ECF No. 1-5 at 22) when she said that "if [a witness] said the exact same words over and over [the petitioner] would say it can't be true, no one would say the exact same words" (Trial Tr. at 820).  The prosecutor was simply responding to defense counsel's argument that E.P. did not remember the incident because she provided inconsistent descriptions of the petitioner's weight and eye color.

The prosecutor's comment that defense counsel's argument boiled down to "[s]houlda shoulda shoulda" was an appropriate response to defense counsel's attacks on the police investigation.  (*E.g.*, Trial Tr. at 807–08 (telling the jury that Detective Kenny should not have put "the same kind of cap [on persons in the lineup] as the description of the perpetrator;" that Mr. Herman's decision not to test certain samples for DNA did not "make sense;" and that "the officer who vouchered [the sweatpants] did not come [to the hospital] for hours").)

Some of the prosecutor's arguments were improper.  For example, she characterized counsel's arguments as "ridiculous" and "preposterous," and assured the jury that there was more than enough evidence to convict the petitioner and that all forensic scientists followed proper protocol.  However, "[a] criminal conviction 'is not to be lightly overturned on the basis of a prosecutor's comments standing alone' in an otherwise fair proceeding."  *Gonzalez v. Sullivan*, 934 F.2d 419, 424 (2d Cir. 1991) (quoting *United States v. Young*, 470 U.S. 1, 11 (1985)).  It "is not enough that the prosecutors' remarks were undesirable or even universally condemned."

*Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citation omitted).  Rather, the "relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Id.* (internal quotation marks and citation omitted).  To determine whether the petitioner was denied due process, courts examine "(1) the severity of the prosecutor's conduct; (2) what steps, if any, the trial court may have taken to remedy any prejudice; and (3) whether the conviction was certain absent the prejudicial conduct."  *Bentley v. Scully*, 41 F.3d 818, 824 (2d Cir. 1994).

The most potentially problematic of her comments was one that she did not finish.  In responding to counsel's argument that the petitioner's consent to the DNA swab was evidence of innocence, the prosecutor said, "So [the petitioner] consented [to the DNA test].  He knew he used a condom . . . [and] didn't leave semen. . . . It's not his first - -"  (Trial Tr. at 839.)  Defense counsel promptly objected, and Judge Chun sustained the objection.  Thus, assuming that she meant to argue that the petitioner had committed other sexual assaults, the jury never heard it.

The remaining statements were not egregious and could not have had "a substantial or injurious effect on the jury's verdict," because the prosecution presented "compelling evidence" that allowed the jury to conclude that the petitioner was guilty beyond a reasonable doubt.  *Bentley*, 41 F.3d at 825; *see United States v. Modica*, 663 F.2d 1173, 1181 (2d Cir. 1981) ("Often, the existence of substantial prejudice turns upon the strength of the government's case: if proof is strong, then the prejudicial effect of the comments tends to be deemed insubstantial . . . ."); *McManus v. Vann*, No. CV-18-3800, 2019 WL 3767538, at *9–16 (E.D.N.Y. Aug. 9, 2019) (declining to overturn a conviction even assuming that the prosecutor mentioned matters not in evidence, vouched for her witness, attempted to shift the burden of proof and

mischaracterized the evidence, because "the evidence of petitioner's guilt was so overwhelming that the outcome would have been the same absent the alleged prejudicial conduct").

## CONCLUSION

For these reasons, the petition for a writ of habeas corpus is denied in its entirety.  The case is dismissed.  A certificate of appealability will not be issued.  *See* 28 U.S.C. § 2553(c).

**SO ORDERED.**

s/Ann M. Donnelly
_____
ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, New York
          October 13, 2023